## THE PEMBROKESHIRE.

(District Court, D. Maryland. December 27, 1920.)

No. 485.

Collision ⬱95(5)—Burdened ship held solely at fault for collision with tow.

A ship passing out through the Cut-Off Channel at night which was the burdened vessel, *held* solely at fault for collision with a barge in a tow of five barges; the evidence not sustaining the ship's claim that the tow was extending diagonally across the channel, which would have made it a fault for the tug to give assent to the passing signal.

In Admiralty. Libel by the J. B. Blades Lumber Company against the steamship Pembrokeshire. Decree rendered for libelant.

John Henry Skeen, of Baltimore, Md., for libelant.

Burlingham, Veeder, Masten & Fearcy, of New York City, and George Forbes, of Baltimore, Md., for respondent steamship Pembrokeshire.

Howard M. Long, of Philadelphia, Pa., and Edward E. Blodgett, of Boston, Mass., for tug Helen.

ROSE, District Judge. About 9 o'clock on the evening of August 28, 1918, the British steamship Pembrokeshire, outward bound from Baltimore, was in collision in the Cut-Off Channel with the lumber-laden barge, Joseph W. Janney, which was the fourth of five barges then being towed from Norfolk to Baltimore by the tug Helen. The steamer was unhurt, but the barge and its cargo suffered injury.

From the bow of the tug to the stern of the rearmost barge was a half mile or more. There was no moon, but it was a good night for seeing lights. The regulation lights were burning on board the steamer, the tug, and upon every one of the five barges, the last of which carried on a yardarm aft the statutory two white lights, showing all around the horizon. In addition, the war being at its height, the powerful searchlights of Ft. Howard were kept continually playing over the channel. There can be no question that everybody saw everybody else, or with any ordinary vigilance should have done so.

Only one person who was on the steamship at the time has been produced as a witness. He was the Maryland pilot then in charge of its navigation. According to his story, while still in the Brewerton Channel, he saw the tug and its tow, but could not make out accurately the position of the barges with reference to the channel buoys until he had completed his turn into the Cut-Off Channel. He then perceived that, while the tug was on the eastern side of the channel, the two rearmost barges were to the westward of it, so that the tug and its tow, in their course diagonal to the channel, were occupying the whole of it. To this cause he ascribes the collision. His explanation is not sufficient. His was the burdened vessel, and, whether the tow was or was not out of its place, he had ample opportunity to see where it was. He does not seriously claim that it changed its course after he first saw it.

⬱For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The only question about which there can be controversy is whether the tug or the barge, or both, were also to blame. The fault alleged against them by the steamship is the failure to observe the narrow channel rule. In view of what was said by the Circuit Court of Appeals for this circuit in The Howard Reeder, 207 Fed. 935, 125 C. C. A. 377, it may be doubtful whether fault can be predicated merely upon the fact, if it were a fact, that the tug and its tow were crossing the channel diagonally, and if the position of the tug and its tow were as the steamship claims it to be, that must have been what the tug was trying to do.

The tide in that part of the Chesapeake, under such conditions as prevailed on the night in question, may be dismissed from consideration. What wind there was might have had some tendency to cause the rearmost barges to sag a little to the westward, but, the tug being where all sides admit that it was, not enough to have put them in the position in which the steamship located them.

The tug, with one blast, answered the one blast signal of the steamship, and by so doing it said that in its opinion it was safe for them to pass port to port. If the flotilla were completely blockading the channel, such signal should not have been given. The tug should have answered the one blast of the steamer with the danger signal, but there is no sufficient reason to believe that any of the barges were at that time, or at any time, to the westward of the channel.

A half dozen or more witnesses, who were on the tug or on the barges, insist that all of them were at the time of the collision, and for an indefinite time before, on the eastern side of the channel. On this question they are definite, precise, and particular. Most of them, to my apprehension, leaving aside for a moment the point presently to be mentioned, stood the test of direct examination and cross-examination better than did the steamship pilot. Nevertheless it is urged, on behalf of the steamer, that what these men testify to shows that it is impossible that the rearmost barges could have been on the eastern side of the channel. For some time before the collision, the tug and the three barges nearest it saw the steamer's red light only, while those on the two rearmost barges saw its green light, and not its red. It is said that this would have been impossible, had all the barges been on the easternmost side of the channel.

When this point was made at the hearing, I regarded it of sufficient importance to request the respective parties to furnish diagrams, each illustrating from its own standpoint what the testimony on this point really indicated. An examination of the charts furnished in compliance with this request shows that it would have been perfectly possible, until the briefest possible time before the collision, for the steamer to have shown her red lights to the tug and to the three foremost barges, and her green light to the two rearmost, even if they had all been on the east side of the channel, and even if they had been, as they say they were, directly in the tug's wake. It is, of course, possible that they may have been a trifle out of line, and yet have been far enough to the east to have left the steamship ample room to

pass in safety. If they had been, they would have seen the green light all the longer.

In what has been said, moreover, no account has been taken of the probability that the green light was visible for a very few degrees across the steamship's bow. Knight's Modern Seamanship, 338.

The pilot admits that it is not usual to take heavy steamers out of the Baltimore harbor at night. He objected to doing so on this occasion. He knew that he was likely to meet tows and that a steamer of the weight, size, and draft of the Pembrokeshire would be hard to control under such conditions. He consented to make the attempt because Admiral Jones, at that time in charge for the British Admiralty of its merchant ships, strongly urged him to do so, stating that war exigencies made it imperative that the steamship should arrive at Hampton Roads in time to join a convoy about to sail. He was overtaken by the danger he had feared. He met a long tow. He did not take proper precautions in time, and when he did at last what he should have done some time sooner he found that he could not handle his steamer so as to prevent the collision.

The ship must be held solely to blame.